**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**WILLIAM MAXEY,**

                    Plaintiff,

      v.

**ALLSTATE INSURANCE COMPANY,**

               Defendant.

No. 17-cv-8392

Hon. Judge Thomas M. Durkin

Hon. Magistrate Judge Susan E. Cox

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

               Respectfully submitted,
               WILLIAM MAXEY,

      By:    /s/ Paul W. Ryan
             One of his attorneys

Eugene K. Hollander
Paul W. Ryan
Jonathan L. Hoeven
**The Law Offices of Eugene K. Hollander**
230 W. Monroe, Suite 1900
Chicago, IL 60606
(312) 425-9100

1

## I.     INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff William Maxey was employed for several years by Allstate as a Marketing Manager. (S[1]8).  He began reporting to Senior Manager of Market Research Ken Kirsten in June 2015.  (S20).  Kirsten made it clear to Maxey from the beginning that he did not like him.  (A[2]1). Kirsten would tell Plaintiff **"shut up, do what I tell you"** when Plaintiff would make suggestions. (A2).  He would tell Plaintiff **"you're stuck in the past, you're old, you don't want to change, you don't want to look at new things."**  (Id).  Almost immediately, Kirsten attempted to get Plaintiff fired.  On February 25, 2016, Kirsten gave Plaintiff a rating of "Inconsistent" on his 2015 Final Review.  (A12).  He then went to Human Resources in Spring 2016 to inquire about the process for placing Plaintiff on an unacceptable notification[3], the final step before termination. (A16).  Kirsten testified that this was prompted by Maxey's "Inconsistent" rating for 2015.  (Id). As discussed more fully below, the rating had no legitimate basis.  It was based entirely on vague unsupported criticisms of Mr. Maxey's performance.  (A11-15).  Kirsten was unable to fire Mr. Maxey as quickly as he wanted to.  Kirsten had gone to HR Consultant Ernest Benson and said "I want to fire Bill," but Benson informed him that there was a process that needed to be followed. (AF16).  Kirsten then went about creating a paper trail of unwarranted criticisms and ultimately fired Maxey on August 9, 2017.  (S37, S45).  Maxey was 67 years old when he was fired.  (S1).

Kirsten made it clear that his performance counseling was a mere formality, and he had no intention of allowing him to keep his job.  Kirsten continually taunted Maxey, telling him he was

---

[1] Citations to Defendant's LR 56.1 Statement of Facts appear as "S" followed by the applicable paragraph number.
[2] Citations to Plaintiff's LR 56.1 Statement of Additional facts appears as "A" followed by the paragraph number.
[3] Although the Defendant contends employees who placed on an unacceptable notification ("UN") are not automatically doomed to termination, the likelihood of a person keeping their job after receiving a UN is very small. (A17).  Human Resources Consultant Christopoulos initially testified that she had never seen an employee rebound from an unacceptable notification.  She then testified that she had seen it happen "more than once."  However, her testimony suggests that it was very unlikely, as she could not even say that it happens more than 5% of the time.  (Id).

going to give him an unacceptable rating. (A28-29). Kirsten lied about Maxey's work performance and gave him unrealistic deadlines. (S53). Kirsten would exclude Plaintiff from meetings with clients or team members. (A18). In later meetings, he would use Plaintiff's absences from earlier meetings to make it look like he was unprepared. (Id). In addition to his open hostility toward Maxey, Kirsten's age bias is reflected in a comment he made to another Senior Manager of Market Research named Priscilla Dixon around Spring 2017. Dixon testified that she was discussing an open position with Kirsten, which would have reported to him, and she brought up the idea of considering a worker who might be fairly senior but willing to work in an individual contributor role. (A3). In response, **<u>Kirsten said he didn't think he wanted another older worker</u>** because they do not always take direction well. (Id). Kirsten also told Plaintiff **<u>"younger people do things faster."</u>** (S50). In light of these statements, Kirsten's comments about Maxey being **<u>"stuck in the past"</u>** can easily be interpreted as ageist. Similarly, Kirsten's comments about getting two people for the price of Maxey's salary could reasonably be interpreted as indicating a desire to replace Mr. Maxey with someone younger. (S50). Kirsten got what he wanted after he terminated Mr. Maxey in August 2017. Maxey was replaced by Leslie Eden, who was 34 years old at the time, about half of Plaintiff's age. (S1, Def. Appendix Exhibit 11, S60).

Defendant argues that Maxey's claim of age discrimination is undercut by the fact that Kirsten did not fire Tamara Romanova, who was 60 years old at the time Plaintiff was terminated. (S59). However, Romanova had her own problems with Kirsten. Like Plaintiff, she received an Inconsistent rating from Kirsten for 2015. (A59). She complained to HR about Kirsten's treatment of her, telling HR that Kirsten was not open to her voicing her opinion to him, so she stopped voicing her opinion and things got better. (A6-7). A reasonable jury could find that Kirsten mistreated Romanova because he found her to be another "older worker" who did not "take

direction well." She may have saved herself by no longer questioning Kirsten, but her continued employment does not prevent a reasonable jury from finding that Plaintiff was terminated because of his age. Kirsten knew that age discrimination was illegal (S54), and a reasonable jury could find that he recognized that terminating both of his older workers would raise a red flag. A former Senior Manager of Market Research named Jeannette Hoogestraat testified that she saw a pattern of older employees losing their jobs and being replaced by people in their late 30s or early 40s. (A8). A reasonable jury could conclude that Plaintiff's termination was part of that pattern.

## II. ARGUMENT

### A. Plaintiff was terminated because of his age

The relevant inquiry on summary judgment in an employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." Ortiz v. Werner Enters., Inc., 834 F.3d 760, 765 (7th Cir. 2016). When the record is viewed in its entirety, there is clearly a genuine issue of fact as to whether Plaintiff was terminated because of his age.

### i. The issues of performance and pretext overlap, and there are genuine issues of fact as to both elements

Defendant claims that Plaintiff did not meet the company's expectations. This claim is pretextual. Accordingly, the analyses of performance and pretext overlap. When a plaintiff claims defendant is lying about its legitimate employment expectations in order to set up a false rationale for terminating him, the question of whether he was meeting defendant's legitimate expectations merges with the question of whether the reasons for firing him are pretextual. Senske v. Sybase, Inc., 588 F.3d 501, 507 (7th Cir. 2009). Pretext exists if the proffered reasons are: (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the

discharge (insufficient in the sense that a reasonable jury could conclude that the reasons were not the actual basis for the firing). Levin v. Madigan, 2011 U.S. Dist. LEXIS 74475, * 59 (N.D. Ill. 2011), *citing* Gusewelle v. City of Wood River, 374 F.3d 569, 575 (7th Cir. 2004). Plaintiff is not required to demonstrate that each criticism by Kirsten is pretextual to defeat summary judgment. See Fischer v. Avanade, Inc., 519 F.3d 393, 404 (7th Cir. 2008).

As an initial matter, Defendant relies heavily on statements in the Performance Reviews Plaintiff received from Kirsten, Plaintiff's Performance Action Plan, the Request for Termination submitted by Kirsten, and other documents relating to Plaintiff's alleged deficiencies. However, these documents are hearsay, and Defendant cannot rely on them to establish the truth of the statements contained therein. At most, some of the documents might be admissible to establish Kirsten's state of mind. Garon v. Miller Container Corp., 2007 U.S. Dist. LEXIS 3561, at *8 (C.D. Ill. 2007). However, even if the documents are offered to establish Kirsten's alleged non-discriminatory state of mind, they must be weighed against other evidence that tends to show that Kirsten's claims about Plaintiff's performance are pretextual and that his true motivation was Maxey's age[4]. Kirsten's claims about Plaintiff's performance are highly suspect. A jury should decide whether he truly believed Plaintiff's performance warranted termination.

Kirsten clearly wanted to fire Plaintiff from the get-go. He was disrespectful to Plaintiff from the beginning, and he continued to speak to Plaintiff in a condescending and disrespectful tone throughout the remainder of his employment (A1). Kirsten tried to set Maxey up for termination early on by giving him an unjustified Inconsistent rating for 2015 on February 25, 2016. (A11-15). Kirsten then tried to use the Inconsistent rating to place Maxey on an

---

[4] Defendant also relies on performance reviews that were given to Plaintiff prior to the time that he reported to Kirsten. They are hearsay, and they were created by employees who had no role in the decision to terminate Maxey. There is no evidence that Kirsten relied on the prior reviews. Accordingly, the prior reviews should be disregarded entirely.

Unacceptable Notification, the final required step in the termination process, in the Spring of 2016. (A16-17). Kirsten ignored the protocol of giving Plaintiff an opportunity to respond to Kirsten's initial evaluation prior to finalizing the performance review. (A10). Furthermore, he had no support for the rating. It was based on misleading allegations and claims that had no factual support. (A11-15). In the 2015 review, Kirsten acknowledged that "Bill has met expectations overall as far as business performance…" (A12). Because he was unable to find anything concrete to criticize Plaintiff for, Kirsten resorted to making vague claims about Plaintiff's leadership abilities, like saying he missed opportunities to "champion win-win solutions." Notably, Kirsten could not identify any specific examples of this or other leadership deficiencies. (A13-15).

Kirsten's initial attempt to terminate Maxey was thwarted by Human Resources. (A16). In 2016, Kirsten continued to seek ways to terminate Plaintiff by giving him vague performance expectations that were incapable of measurement. In late March or early April 2016, Kirsten gave Plaintiff and his other direct report, Tamara Romanova, the following goals for 2016: Take ownership, Make it Simple, Collaborate, Synthesize, and Drive Insights. (A20). At the meeting and over the next few months, Plaintiff repeatedly asked for clarification of the goals, but Kirsten refused. (Id). In August 2016, Kirsten told Plaintiff that he was told by HR that that he did not have to provide clarification of the goals. (Id). This was a lie. (Id). Plaintiff spoke to Human Resources Consultant Ernest Benson, who told him that Kirsten's statement was untrue. (Id).

Kirsten gave Plaintiff another unwarranted Inconsistent rating for 2016. For example, Kirsten's claim in the 2016 review that "Bill does not write many presentations or summaries, and instead relies on suppliers or others to write results" was false. (Response to S25). Kirsten criticized Plaintiff for handing off complex requests to others and forwarding documents without taking ownership of checking their quality. The vague allegation about handing off complex

requests was unfounded. Plaintiff merely delegated work to the company's analytical teams, in accordance with the normal practice. (A21). As for the claim that Plaintiff forwarded documents without taking ownership of checking the quality, Defendant claims that Plaintiff "passed along a spreadsheet created by someone else without catching that two key metrics were swapped. Plaintiff does not recall doing that, and Kirsten never brought it up until the review. (Response to S25). (Id). In any event, this criticism is largely immaterial, as Kirsten himself acknowledged that Plaintiff improved in these areas. (A21).

Kirsten's other criticisms in the 2016 review are extremely vague, misleading, or simply untrue. For example, in paragraph 26 of its statement of facts, Defendant claims that "Plaintiff did not consistently communicate updates on the investigation of the shopping rate differences between the two studies." This criticism presupposes that there were updates to provide and provides no detail as to the specific nature of the updates that Kirsten was allegedly expecting. Notably, Kirsten did not even know if an explanation for the differences in the two studies existed. (A23). Kirsten also faulted Plaintiff for not being prepared to share updates on pilot studies at a meeting in July 2016, but he could not identify any specifics to support his claim that Plaintiff was not prepared to share updates on the pilot studies[5]. (A25). Kirsten also claimed that "when asked to provide a summary of the timeline and key activities for an analysis, Bill did not produce the specific details as requested." However, Plaintiff did provide a timeline, and he shared the results of the studies when they became available. (A26). Defendant fails to identify the "specific details" that were missing. Kirsten claimed that Plaintiff was inconsistent in joining MARA monthly meetings or Marketing meetings, but it is undisputed that these meetings were not mandatory as long as there was a valid reason for not being there. (A24). Furthermore, Plaintiff missed no more

_____

[5] Kirsten also acknowledged that Plaintiff later got up to speed on the pilot studies. (A25).

than two of each type of meeting in 2016, and he always had a valid reason for doing so. (Id). The claim that Plaintiff's attendance record for these non-mandatory meetings was "inconsistent" is not credible. Kirsten also unfairly criticized Plaintiff for declining a meeting with the Digital Team. (A27). Kirsten knew that Plaintiff had no involvement with the program that was the subject of the meeting, but he disingenuously blamed Plaintiff for not attending. (Id).

In April 2017, Kirsten continued his attempt to create a paper trial to try to justify terminating Maxey by placing him on a Performance Action Plan ("PAP"). Kirsten had made it clear to Plaintiff that he would be terminated, regardless of his performance. (A29). Like the reviews, the claims about Maxey's performance in the PAP are misleading or vague. For example, in paragraph 30, Kirsten criticized Plaintiff for recommending that a business partner contact Mu Sigma directly to obtain a different breakdown of some data that she already had. (A22). This took place in January 2017. (Id). Plaintiff informed Kirsten that he had advised the business partner to work directly with the supplier. (Id). Kirsten had no problem with it at the time. (Id). In fact, he had frequently done the same thing. (Id). Nevertheless, he attempted to use this against Plaintiff months later in April 2017. (S30). Kirsten's hypocritical after-the-fact criticism of Plaintiff is strong evidence of pretext. Furthermore, Kirsten could not even identify whether there was any problem with the quality of the research that was shared with the business partners. (A30).

In paragraph 31 of its Rule 56 statement, Defendant claims that Kirsten received "feedback that a business partner 'was losing trust that the project details were being managed properly,' including that Plaintiff 'was unprepared to answer questions from the business partner'" and that Plaintiff "did not review previous research and was, therefore, "not prepared to share feedback on the interview discussion guide during the meeting with the business partner." What questions was Plaintiff unable to answer? The complete absence of detail makes it nearly impossible for Plaintiff

to respond to Defendant's claims. Nevertheless, Plaintiff does recall that, contrary to Kirsten's claim, he did review the research and told Kirsten that it was not relevant. (A35). The claim that Plaintiff "delayed" sending changes to the supplier is misleading, at best. The changes were suggested in a meeting that ended at 5:00 p.m., and he sent the feedback the next morning around 6:30 a.m. (A31). Kirsten's flimsy allegations illustrate his desperation to find anything, no matter how lacking in substance, to use as an excuse to fire Plaintiff.

Also in paragraph 31 of its Rule 56 statement, Defendant cites a "meeting recap note" that Plaintiff allegedly sent stating "no further changes to the guide for now." The alleged note is referenced in his PAP, but it is not attached to Defendant's motion, and does not appear to have been produced in discovery. Without seeing the note in context, it is impossible to evaluate whether it truly supports Defendant's claim that Plaintiff did not meet expectations. Defendant's claim in paragraph 33 of its statement of facts is also vague. Defendant contends that a business partner provided feedback to Kirsten "that inconsistencies between what was discussed during [the] project update meetings and what was being done was causing concern." However, Defendant does not identify the alleged inconsistencies.

In paragraph 32 of its LR 56.1 statement, Defendant contends that Plaintiff failed to offer meaningful input at meetings, but these vague allegations are baseless. (Response to S32). Kirsten's criticism is unwarranted. For example, although he claimed to find fault with Plaintiff's lack of suggestions regarding the Shopping-Tracker questionnaire, he acknowledged that there was nothing wrong with it the way it was. (A32). In paragraph 33 of its LR 56.1 statement, Defendant claims that "Plaintiff sent a report to the business partner without sending it to [the] Director or VP for initial review and alignment, as was requested in 2016 as a protocol for sharing research with business partners." However, Brett Sever had previously stated in a MARA meeting

9

that if a senior business partner needed to see a document, it was acceptable to send it to them without first sending it to him and Pam Moy. (A33). Kirsten was aware of this because he was present at the MARA meeting. (Id).

Defendant claims that Plaintiff did not improve his performance after he was placed on a PAP, but this allegation is entirely conclusory. Defendant provides no explanation as to how Plaintiff's performance did not meet the "Requirements to Achieve" in the PAP and why his transition to an Unacceptable Notification was warranted. This is unsurprising, as Kirsten wanted to put Maxey on a UN right off the bat, telling Human Resources in Spring 2016 "I want to fire Bill." Furthermore, it is clear that Kirsten had no interest in seeing Plaintiff improve his performance, **as he began drafting his request for termination before the UN period was even over**. (S37). Defendant's argument that Plaintiff did not meet the expectations of the UN relies heavily on vague assertions, like claiming Plaintiff failed to "come prepared for meetings, incorporate feedback from business partners, and be transparent with business partners." (S37). It is also based on misleading claims. For example, Kirsten claimed that Plaintiff did not send summaries of meetings on July 11th, July 13th, and July 20th of 2017. (S39). However, the Termination Request states that Plaintiff sent a note on July 12th to the team requesting feedback, that he sent an update of the draft questionnaire on July 13th after the meeting, and that Plaintiff sent a preliminary project plan after the July 20th meeting, per the project team's request. (SF 39 at Defendant Appendix Exhibit 17, pg. 1). Clearly, Plaintiff was engaged with the project. Kirsten's demand that Plaintiff send summaries of each meeting was an attempt to load Plaintiff up with busy work, hoping that some of it would slip through the cracks. Furthermore, Kirsten unfairly blamed Plaintiff for not including the status of the selection of the agents in the preliminary project plan, which is not something that was even supposed to be included. (Response to SF39).

10

Kirsten claimed that Plaintiff was wrong to send a project plan that included new research rather than synthesizing existing research, citing this as an example of Maxey not understanding project needs. (S40). Kirsten failed to acknowledge that Plaintiff explained that the old research did not address the issue that the business partner wanted to investigate. (A34). Plaintiff told him that new research was necessary to address the business partner's specific issue. (Id). When Kirsten nevertheless insisted on synthesizing the old irrelevant research, Plaintiff complied. (Id). Kirsten cited **the same incident** for his conclusion that Plaintiff failed to meet both his second and third goals in the UN, "Drive Insights" and We Drive Results." (S41). Kirsten could not come up with anything else to use against Plaintiff for the third goal, so he resorted to bootstrapping.

Kirsten also unjustifiably faulted Plaintiff for using his discretion in deciding which existing research to provide in response to a business partner's request for claims-related research. (S42). When Plaintiff showed Kirsten the research he had originally excluded, Kirsten acknowledged that it was not relevant. (A35). Kirsten still had Plaintiff send the research to the business partner, and not surprisingly, the business partner indicated it was not what they were looking for. (A35). Nevertheless, Kirsten used this episode to further his ulterior motive of firing Plaintiff because of his age. Also in paragraph 42, Defendant relies on Kirsten's claim that Plaintiff caused unnecessary and redundant work when he had the analytics partner create additional reports that were allegedly available from a separate supplier. The claim was false. (Response to S42). Furthermore, Kirsten claimed that he expected Plaintiff to consult him before going to the analytics partner, but there is no basis for his claim. (Id).

In addition to the evidence that Kirsten's assessment of Plaintiff was dishonest, Kirsten's ageist statements (S50; A2-3) are also compelling evidence of pretext, if not direct evidence of age discrimination. See Futrell v. J.I. Case, 38 F.3d 342, 347 (7th Cir. 1994). Kirsten's statement that

11

**he did not want another older worker** is troubling, as evidenced by the fact that Priscilla Dixon mentioned it to Jeanette Hoogestraat, which led them to discuss how many older employees had been let go. (A2, 8). Furthermore, Human Resources Consultant Connie Christopoulos acknowledged that such a comment would raise a concern to her about possible unfair treatment based on age. (A4). Kirsten's comments **"you're stuck in the past, you're old, you don't want to change, you don't want to look at new things"** (A2) and **"younger people do things faster"** (S5) are also strong evidence of pretext. Additionally, Kirsten laughed at jokes about an older employee. (A5). Kirsten's generally hostile treatment of Plaintiff demonstrates pretext as well. Although some of Kirsten's mistreatment of Plaintiff was not explicitly ageist, a reasonable jury could find that it stemmed from an underlying age bias in light of his stated aversion to "older workers." Harassing behavior does not have to be accompanied by explicit discriminatory comments. See Shanoff v. Ill. Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. Ill. 2001), *citing* Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999). Additionally, the fact that Kirsten made it clear that he would terminate Plaintiff regardless of his performance is further evidence of pretext (A16, 28-29). See Lerman v. Turner, 2013 U.S. Dist. LEXIS 118479, *41-43 (N.D. Ill. 2013) (Evidence that outcome of investigation was predetermined supported finding that proffered reason for plaintiff's termination was pretextual). Furthermore, Kirsten's similar treatment of Tamara Romanova also bolsters Plaintiff's age discrimination claim. (A6-7). Although Kirsten stopped short of terminating her, a reasonable jury could find his hostility toward another older worker probative of Kirsten's age bias and that Kirsten knew that terminating both Romanova and Plaintiff would make his age bias too obvious. (S54).

Moreover, as Jeannette Hoogestraat testified, there was a pattern of older managers being terminated around the same time as Plaintiff and replaced with substantially younger employees

12

by Sever and Kirsten's boss, Pam Moy. (A8). Ms. Hoogestraat herself was 54 when her position was "eliminated" in 2018. (Def. Appendix Ex. 11; A8). Additionally, Kirsten's boss, Brett Sever, terminated Laura Graff, a 62 year-old manager who reported to Ms. Hoogestraat, without consulting Ms. Hoogestraat. Ms. Graff was terminated at the end of a performance improvement plan despite the fact that her performance had improved and Ms. Hoogestraat did not plan to terminate her. (A9). This pattern demonstrates a broader culture of age bias, which is further evidence of age discrimination. See Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 491 (7th Cir. 2007); Mattenson v. Baxter Healthcare Corp., 438 F.3d 763, 770 (7th Cir. 2006).

   *ii.*     *Plaintiff has established the fourth prong of his prima facie case*

   "In situations involving the simple termination of a single employee, normally the employee must establish that the employer *sought a younger replacement* for him." Miller v. Borden, Inc., 168 F.3d 308, 313 (7th Cir. 1999) (emphasis in original). "An ADEA plaintiff can establish the fourth prong by showing that he was replaced by someone 'substantially younger…'" Denisi v. Dominick's Finer Foods, 99 F.3d 860, 864 (7th Cir. 1996), *citations omitted*. Plaintiff was replaced by Leslie Eden, who was 34 years old at the time. Although the replacement of Plaintiff with someone approximately half his age is sufficient to meet his burden under the fourth prong of *McDonnell Douglas*, there is also evidence that Kirsten has critiqued Ms. Eden when she missed opportunities to probe deeper with internal business partners or communicate more frequently on project status. (Response to S57). Nevertheless, Kirsten has never disciplined her, and he rated her as "exceeding expectations." (Id). Kirsten decided to rate Plaintiff Inconsistent based on factually unsupported assertions like claiming that Plaintiff did not "champion win-win solutions." (A13-14). Despite Leslie Eden's missed opportunities, Kirsten gave her the highest rating possible. A reasonable jury could easily infer age discrimination from these facts.

iii.    *A reasonable jury could find that Plaintiff would not have been terminated but for his age*

Kirsten tried to terminate him shortly after becoming his supervisor. Although his initial attempt was unsuccessful, he made it clear to Plaintiff that his termination was a foregone conclusion, regardless of Plaintiff's performance. As discussed above, Kirsten followed up on his threats by concocting a baseless case for firing Plaintiff. Kirsten then replaced Plaintiff with someone half his age. Kirsten made ageist remarks, which are compelling evidence of age discrimination. It is well established that "age []-based comments, in some cases occurring months before or after the alleged discriminatory act and in others at unspecified times, can still be considered under the direct method." Nagle v. Vill. of Calumet Park, 554 F.3d 1106, 1115 (7th Cir. 2009). Defendant does not even address Kirsten's comment that **he did not want another older worker**. Defendant's silence on this point speaks volumes. Defendant is unable to make any convincing argument to undermine the weight of this clearly ageist statement. Indeed, an Allstate Human Resources Consultant testified that the statement would raise concerns about age bias. (A4). Kirsten also treated his other older subordinate poorly. (A6-7). Another Senior Manager of Market Research testified that she saw a pattern of older workers being terminated and replaced by younger workers. (A8-9). Viewing the record as a whole, it is clear that Plaintiff can prove that his age was the "but for" cause of his termination.

Defendant notes that Plaintiff was 57 when he was hired, but this is irrelevant. First, Plaintiff was not hired by the same person who decided to terminate him. (A36). Furthermore, he was ten years older at the time of his termination, which is significant. See Hartley v. Wis. Bell, 124 F.3d 887, 893 (7th Cir. 1997) (ten-year difference in ages between the plaintiff and replacement presumptively substantial). Defendant also argues that Plaintiff's claim is undermined by the fact that Kirsten is in the same protected class. This is also unpersuasive, as

Kirsten is 18 years younger than Plaintiff. (S1, S20). Defendant also cites the fact that there were other older workers who reported up to Brett Sever. (S58). This fact does not support summary judgment, as Kirsten was the decisionmaker, not Sever.

II. <u>Defendant has not shown that Plaintiff failed to mitigate his damages</u>

Defendant has not offered any admissible evidence to support its failure to mitigate defense. Plaintiff did not receive any actual offers of employment. (Response to S62). The individuals who allegedly told Plaintiff that he would be hired if he agreed to a certain salary are unidentified. <u>Patterson v. World Wrestling Entm't, Inc.</u>, 2006 U.S. Dist. LEXIS 7453, at *79 (E.D. Wis. 2006) (Witness's report of what the unidentified person told him is inadmissible hearsay evidence). Furthermore, the statements are hearsay. Even if Defendant's failure to mitigate argument was supported by admissible evidence, it would fail. At most, Defendant would be able to establish that Plaintiff could have accepted a job that paid "approximately" $90,000 in salary. Plaintiff's salary at Allstate was $106,694. (A37). An annual salary of $90,000 would have been **more than a 15% pay cut than what Plaintiff earned at Allstate.** Plaintiff is only obligated to accept a "substantially equivalent position," meaning a position which affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." <u>Meyer v. United Air Lines, Inc.</u>, 950 F.Supp. 874, 876 (N.D. Ill. 1997). A reasonable jury could easily find that a job paying 15% less is not "substantially equivalent." <u>See</u> <u>Becerril v. E. Bronx NAACP Child Dev. Ctr.</u>, 2009 WL 2611950 *5 (S.D.N.Y. 2009) (Job paying $55,000 not comparable to job paying $65,000). The one case where the type of offset sought by Defendant was allowed was decided wrongly. The court there noted that the alternative position was **"a demotion, to be sure,"** but it nevertheless held that the rejection of the position constituted a

failure to mitigate.  A plaintiff is not required to accept a demotion.  <u>Meyer</u>, 950 F.Supp. at 876, *citing* <u>Ford Motor Co., v. EEOC</u>, 458 U.S. 219, 231 (1982).

In claiming that Plaintiff rejected a job that paid $5,000 less than his job at Allstate, Defendant insinuates that Plaintiff would have received a bonus of 10% at a subsequent job. However, this is entirely speculative.  First, there is no evidence that any employer actually offered Maxey a bonus of 10%.  Maxey testified that he did not know what the bonus potential was, but that it was around 10% because "that's what most companies will offer you, around 10 percent." (Response to S62).  Clearly, Maxey's testimony indicates that he was guessing what the bonus percentage was.  Second, there is no evidence regarding the criteria for receiving the alleged bonus or the likelihood that Plaintiff would receive the full bonus or any bonus at all.

Finally, Defendant has not identified the dates of the interviews on which it bases its affirmative defenses, other than that they took place in 2017.  Defendant notes that the weather was "not bad" and there was no snow on the ground, but that could mean any number of things and does not help place the date.  The date of the alleged failure to mitigate is critical to assessing at what point Plaintiff's damages should be reduced.  Indeed, although Plaintiff testified that he had a face-to-face interview with Abbott in 2017, there is evidence that contradicts that testimony. A recruiter contacted Abbott on Plaintiff's behalf.  (A38).  Mr. Maxey did not authorize that recruiter to act on his behalf until January 29, 2018.  (A38).  Accordingly, Mr. Maxey could not have had the interview with Abbott in 2017.  The uncertainty as to when Plaintiff had his interviews further demonstrates that summary judgment on the failure to mitigate defense should be denied.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff William Maxey respectfully requests that this Court deny the Defendant's Motion for Summary Judgment in its entirety.

16

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused the foregoing **Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment** to be served upon all counsel of record by filing same using the Court's CM/ECF system on this 15th day of July 2019.

/s/ Paul W. Ryan