# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM MAXEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 8392 |
| v. | ) | |
| | ) | |
| ALLSTATE INSURANCE COMPANY, | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Maxey brings this lawsuit against Allstate Insurance Company ("Allstate") alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1] Allstate moved for summary judgment. R. 48-1. For the reasons set forth below, the Court denies Allstate's motion.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To

---

[1] Maxey's operative complaint also included a claim for retaliation. *See* R. 21, Count II. The parties stipulated to the dismissal of that claim prior to Allstate filing its motion for summary judgment. R. 44.

defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

The following facts are undisputed unless otherwise noted. In February 2008, at 57 years old (DOB April 10, 1950), Maxey was hired into Allstate's Marketing, Analysis, Research and Administration ("MARA") department as a Market Research Manager—a position in which he remained throughout his employment. R. 48-2 ¶¶ 1, 8-9; R. 53 ¶¶ 1, 8-9. Maxey's duties included meeting with business partners to define and develop research needs and plans, collaborating with vendors, and analyzing and interpreting market research data. R. 48-2 ¶ 10; R. 53 ¶ 10. He reported to several different managers during his employment.

Maxey's annual performance reviews permitted four possible ratings: Better Than Expected; Expected; Inconsistent; and Unacceptable. R. 48-2 ¶ 12; R. 53 ¶ 12. Maxey reported to Jerry Otto Boldt (DOB December 18, 1965) throughout 2011 and 2012. Boldt assigned Maxey an overall performance rating of "Inconsistent" for 2011, noting (among other things) errors in Maxey's research reports, and that Maxey needed to be "more proactive in anticipating issues" with research data. R. 48-2 ¶¶

13-14; R. 53 ¶¶ 13-14. Maxey received another "Inconsistent" rating in 2012. R. 48, Ex. 6.

In 2013, Maxey reported to Boldt for part of the year, and Sherri Winters (DOB February 6, 1970) for the rest, and again earned an overall rating of "Inconsistent." R. 53 ¶ 17; R. 48, Ex. 7. According to Boldt, Maxey needed to add more insight from tracking studies and special projects that he managed and keep his managers updated, while Winters noted that she had seen improvement, and that Maxey was "[d]evelop[ing] more insights from the tracking studies." R. 48, Ex. 7.

Maxey continued to report to Winters in 2014. R. 48-2 ¶ 19. Winters elevated Maxey's performance rating to "Expected" that year, noting that he "continued to manage the claims tracking studies successfully," but needed to "more effectively share information," "offer insights," and "coach the organization on tactics to improve loyalty scores." R. 48, Ex. 8.

Winters left the company mid-way through 2015, and Maxey began reporting to Ken Kirsten (DOB May 24, 1968). At the time, Kirsten was 47 years old, and Maxey was 65. R. 48-2 ¶ 20; R. 53 ¶ 20. Kirsten rated Maxey's 2015 performance as "Inconsistent," noting that Maxey was "meeting expectations for day-to-day project management," but that there remained an "opportunity to be viewed as a thought leader on the shopping behavior." R. 48 ¶ 22; R. 53 ¶ 22.

After delivering Maxey's 2015 performance review, Kirsten considered placing Maxey on an "Unacceptable Notification" ("UN") right away—the unsuccessful completion of which could lead to termination—and asked Human Resources about

the performance review process leading up to a UN. R. 48-2 ¶ 35; R. 53 ¶ 35; R. 48, Ex. 9 at 19-20. But initially no such plan was implemented. Instead, according to Maxey, Kirsten frequently replaced the weekly face-to-face meeting the two were supposed to have with lengthy emails, and began every meeting the two did have by stating that Maxey was "trending toward unacceptable." R. 53 ¶ 28; R. 56 ¶ 28. Maxey also states that he repeatedly sought and was refused clarification from Kirsten on his 2016 goals, and that Kirsten deliberately excluded him from 8 client meetings between February 2016 and March 2017, causing him to be unprepared for later meetings at which Kirsten tried to embarrass Maxey. R. 53 ¶¶ 18, 20. Kirsten denies these claims. R. 56 ¶¶ 18, 20.

Kirsten rated Maxey's 2016 performance as "Inconsistent," noting in particular that Maxey "tend[ed] to handoff more complex requests to others and then simply forward[ ] results without taking ownership of checking the quality," and that he did not "write many presentations or summaries," and "relie[d] on suppliers or others to write results." R. 48, Ex. 14. As discussed further below, Maxey disputes this and other representations.

**_Performance action plan, unacceptable notification and termination._** In April 2017, Kirsten placed Maxey on a 45-day performance action plan ("PAP"). Before doing so, he told Maxey "I'm going to rate you unacceptable. I'm letting you know that now." R. 53 ¶ 29; R. 56 ¶ 29. Thereafter, in June 2017, Kirsten informed Maxey that he was being placed on a 30-day UN, because he had not improved his performance as required by his PAP. R. 48-2 ¶ 36; R. 53 ¶ 36. Once a UN is

implemented, two outcomes are possible: (1) removal of the UN for improved performance; or (2) termination for failure to improve. R. 48-2 ¶¶ 35, 43; R. 53 ¶¶ 35, 43. Maxey and Kirsten had regular meetings regarding Maxey's progress under the UN. *Id.* But halfway through the UN period, Kirsten began preparing a formal request for Maxey's termination ("RFT"), purportedly having concluded that Maxey was trending toward not meeting those expectations. R. 48-2 ¶ 37; R. 53 ¶ 37. MARA department director Brett Sever, MARA Vice President Pam Moy, and HR approved the RFT, R. 48-2 ¶ 38; R. 53 ¶ 38, and Maxey was terminated on August 9, 2017, R. 48-2 ¶ 45; R. 52 ¶ 45.

**Kirsten's behavior and comments toward Maxey.** According to Maxey, Kirsten was nasty toward him throughout the period in which Maxey reported to him, lied in his performance reviews, put pressure on him to turn projects around in a time period that was not possible, and threatened to fire him in the days leading up to his termination. R. 53 ¶ 53.

In addition, Maxey contends that Kirsten told him at various points that Maxey was "old," "stuck in the past," "[did]'t want to change," and "[did]n't want to look at new things," and that "we could get two people for what we pay for you," "you're not worth the money you're making," "younger people do things faster," and "go get your glasses." R. 53 ¶ 50; R. 56 ¶ 2. Kirsten denies making these or any other arguably age-related comments. *Id.*

Priscilla Dixon (DOB March 18, 1957), a Senior Manager of Market Research like Kirsten, also testified that in Spring 2017, Kirsten told her in connection with

hiring for another position that he did not want to work with another older worker because older workers didn't always take direction well. R. 54, Ex. B at 10-13. Dixon is not familiar with Maxey's job performance or the reason for his termination. *Id.* at 19.

**Ages of MARA department employees and Maxey's replacement.** Allstate hired Leslie Eden to replace Maxey. She was 34 years old at the time (DOB August 21, 1983), and her salary was greater than Maxey's $106,694. R. 48-2 ¶ 57; R. 53 ¶ 57; R. 56 ¶ 37. Of the 11 employees who made up the MARA department when Maxey was terminated, 8 were born in or before 1974, including Maxey and Kirsten. R. 48-2 ¶ 58; R. 53 ¶ 58. Maxey was the oldest MARA employee at the time, followed by Tamara Romanova, the other Market Research Manager who reported to Kirsten, who was 7 years his junior (DOB May 10, 1957). R. 48, Ex. 2 ¶ 12 and Ex. 11. Romanova also received an "Inconsistent" performance rating for 2015, but improved to an "Expected" rating for 2016, remains employed by Allstate, and continues to report to Kirsten. R. 48-2 ¶ 59; R. 53 ¶ 59.

**Post-termination employment search.** Maxey began looking for a new job after his termination, but remains unemployed. R. 48-2 ¶ 61; R. 53 ¶ 61. He received three face-to-face interviews for full-time market research manager positions shortly after leaving Allstate, but was unable to satisfactorily negotiate his salary with any of the employers and states that he did not receive any formal offers. Nevertheless, Maxey testified that if he had agreed to take the salary each employer had proposed (which ranged from $80,000 to $90,000), he would have been hired. R. 53 ¶¶ 62-65.

**Analysis**

Allstate argues: (1) that no genuine issues of fact remain for trial on Maxey's age discrimination claim; and (2) in the alternative, that summary judgment is proper on the issue of mitigation, and any damages to which Maxey may be entitled should be reduced by $90,000 per year—the highest salary refused by Maxey after his termination. The Court addresses Allstate's arguments in turn.

## I.    Merits

The ADEA makes it unlawful for employers to discriminate against employees who are 40 years old or older because of their age. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (citing 29 U.S.C. §§ 623(a)(1) and 631(a)). "To prevail on an age-discrimination claim, the plaintiff must prove that his age was the 'but-for' cause" of the challenged adverse employment action. *Wrolstad v. Cuna Mutual Society*, 911 F.3d 450, 454 (7th Cir. 2018) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 177-78 (2009)).

Traditionally, a discrimination plaintiff could survive summary judgment by "presenting direct or circumstantial evidence that [the employer] took the challenged job action against him because of his age"—referred to as the "direct method." *Wrolstad*, 911 F.3d at 454. Alternatively, a plaintiff could proceed under the "indirect method"—or *McDonnell Douglas* burden-shifting framework—by "producing evidence that a similarly situated person not in the protected class was treated more favorably." *Id.* But in *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit ordered district courts to "stop separating 'direct' from 'indirect' evidence and proceeding as if

7

they [are] subject to different legal standards." 834 F.3d 760 (7th Cir. 2016). The *Ortiz* court reaffirmed that the *McDonnell Douglas* burden-shifting test was one framework for analyzing a discrimination claim, but directed that going forward, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766. Thus, "the basic question at the summary-judgment stage is whether the evidence as a whole would allow a reasonable jury to find that the plaintiff suffered an adverse job action *because of* his age." *Wrolstad*, 911 F.3d at 455 (emphasis added); *see also Ortiz*, 834 F.3d at 765 ("Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'").

Allstate argues that Maxey cannot establish a genuine issue for trial under *McDonnell Douglas*, and cannot otherwise demonstrate that his age was the but-for cause of his termination. But Allstate addresses Kirsten's arguably age-related comments largely separate from the remaining evidence. *See generally* R. 48-25. This approach was overruled in *Ortiz. See Harper v. Bob Rohrman Pre-Owned Car Superstore*, 2019 WL 1281987, at *5 (N.D. Ill. Mar. 20, 2019) (noting that the defendant impermissibly "sequestered in a box labeled 'direct' and considered separately from other evidence" manager's age-related statements, and that discussing evidence holistically was "more straightforward"). Accordingly, while the Court begins by analyzing all of the evidence under the *McDonnell Douglas* framework, it then assesses "cumulatively all the evidence presented" to determine whether a reasonable factfinder could conclude that Maxey was terminated because

of his age. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (quoting *Ortiz*, 846 F.3d at 765).

**McDonnell Douglas.** Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, showing that: (1) he is a member of a protected class (here, 40 or older); (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably. *Hutt v. AbbVie Prods., LLC*, 757 F.3d 687, 693 (7th Cir. 2014). If the plaintiff can establish a prima facie case, the burden shifts to his employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765. The burden then shifts back to the plaintiff to demonstrate that the employer's explanation is pretextual. *Id.*

There is no dispute that Maxey was over 40 at all relevant times and that his termination constitutes an adverse employment action. But Allstate contends Maxey has no evidence from which a reasonable jury could conclude either that he was performing his job satisfactorily, or that similarly situated employees outside of his protected class were treated more favorably. In fact, Allstate argues that there is no evidence of any similarly situated employee under Kirsten's direction who was under 40 when Maxey was terminated, pointing out that Maxey's only counterpart, Romanova, was 60 at the time and remains employed by Allstate (reporting to Kirsten). But Allstate misses that Maxey can satisfy the fourth element by

demonstrating that Allstate sought a substantially younger replacement. *See Olson v. N. FS, Inc.*, 387 F.3d 632, 635-36 (7th Cir. 2004) (when an "employee within the protected class has been discharged and replaced, we have required that the employee show only . . . that the employer hired someone else who was substantially younger.") (internal citations omitted). Maxey's replacement, Leslie Eden, then age 34, was just over half Maxey's age (67), and thus "substantially younger" than he. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003) (defining "substantially younger" as ten years or more).

Nevertheless, Allstate contends without citing authority that any inference of discrimination fails because other managers were involved in the decision to hire Eden. R. 55 at 9. But Allstate cites Priscilla Dixon's deposition testimony in support, and while Dixon testified unequivocally that Kristen played a role in the hiring decision, she didn't "know for certain" who else—or even if anyone else—was involved. R. 54, Ex. B at 17, 18 (Dixon deposition excerpt indicating that hiring is "usually sort of a team decision so I don't know if there was one person or multiple people who weighed in on it"). Kirsten's involvement is sufficient to satisfy the fourth element.

Allstate also argues that Maxey's history of "Inconsistent" ratings and failure to improve during the PAP and UN periods belie any contention that he was performing his job satisfactorily. Because Allstate's proffered reason for Maxey's termination was Maxey's failure to perform his job satisfactorily, the analysis of that prong of his prima facie case "merges" with the question of pretext. *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013); *see also Senske v. Sybase, Inc.*, 588 F.3d 501, 507

(7th Cir. 2009) (in such a case, the court "focus[es] on the question of pretext, bearing in mind that without sufficient evidence of pretext [the plaintiff] cannot show that he was meeting [the employer's] legitimate expectations."). To show pretext, Maxey needs evidence that Allstate was "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, 675 Fed. App'x 615, 620 (7th Cir. 2017); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("The question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason."). He can do so "directly by showing that a discriminatory reason more likely motivated his termination, or indirectly by showing that [Allstate's] explanations are unworthy of credence." *Senske*, 588 F.3d at 507.

At the outset, Maxey argues that the statements in his performance reviews, PAP, UN and RFT are inadmissible hearsay. R. 52 at 5. But the issue is whether those statements accurately reflect Kirsten's honestly held beliefs, not whether they are true.[2] Documents purporting to reflect Kirsten's perceptions of Maxey's performance are admissible for that purpose, so the Court considers them here.

But Maxey also argues that the evidence shows that Kirsten did not truly believe Maxey's performance warranted termination. And that contention has teeth. Indeed, Maxey combs his performance documentation under Kirsten for

---

[2] Maxey himself seems to acknowledge this. *See id.* (stating "some of the documents might be admissible to establish Kirsten's state of mind.").

mischaracterizations and falsehoods, pulling out plenty. By way of example, Maxey characterizes the representation in his 2016 performance review that Maxey did not "write many presentations or summaries, and instead relie[d] on suppliers or others to write results," R. 48, Ex. 16 at 4, as a "flat out lie," R. 48, Ex. 1 at 178-79. He explains that he prepared and presented reports on surveys of "2 or 300 people" on his own, and that while he did work with outside consultants that manage "heavy databases" for larger surveys involving millions of customers, that was the common practice, and he was still involved with those surveys, "convert[ing ] and writ[ing] [his] own version that people at Allstate understand." R. 48, Ex. 1 at 178-79. Maxey also disputes the criticism that he failed to attend a meeting on a project that was his responsibility, *see* R. 48, Ex. 16 at 9-10, testifying at his deposition that Kirsten "set [the project] up," and that Maxey "knew nothing about it." R. 48, Ex. 1 at 177-78.

Maxey makes similar arguments about the representations in his PAP. There, Kirsten indicated that Maxey recommended that a business partner work directly with a supplier to obtain certain data, which left Maxey unable to review the quality of the information before it was shared. R. 48, Ex. 12 at 4. But Maxey explains that in actuality: 1) the business partner already had the data, and simply wanted it to be organized differently; 2) Maxey reviewed the (reorganized) data from the supplier before passing it on to the business partner; 3) Maxey told Kirsten how he handled the matter at the time and Kirsten made no objection; and, perhaps most importantly, 4) Kirsten had advised others to do the same under the same circumstances "numerous times." R. 54, Ex. A ¶ 6. The PAP also cites Maxey's failure to suggest

improvements to certain projects. R. 48, Ex. 12 at 4. But the record evidence creates doubt as to whether improvements were necessary in each case. *See* R. 48, Ex. 9 at 142 (Kirsten's deposition testimony stating that "the expectation in [Maxey's] role wasn't to contribute zero" to the "shopping-tracking questionnaire" at issue, but also noting that there wasn't anything "wrong" with the project); *see also* R. 54, Ex. A ¶ 9 (Maxey's declaration stating that Kirsten asked for a recommendation about the shopping-tracker questionnaire, and he explained that none were necessary). The PAP also states that Maxey sent a report to a business partner without first sending it to Sever or Moy "for initial review." R. 48, Ex. 12 at 5. But according to Maxey, at an earlier MARA meeting at which Kirsten was present, Sever stated "don't let us be a bottleneck" if business partners needed to see a document (referring to Sever and Moy). R. 54, Ex. A ¶ 11.

Kirsten repeated many of the alleged failures highlighted in Maxey's PAP in his UN, which rated Maxey's performance "unacceptable" as to each of his goals, specifically: take ownership of project work; drive insights; and the leadership principles "We Drive Results;" and "We're Transparent." *See generally* R. 48, Ex. 16. And according to the RFT, Maxey failed to meet the same goals during the UN period. But Maxey disputes that representation, too. As to taking "ownership of all project work," the RFT cites Maxey's purported failures with respect to a particular project to: send summaries of three meetings with the business partner; provide a project plan and timeline until asked by the same business partner after the third such meeting; and include certain key details in the plan when submitted, including the

"status of the selection of the agents for the interviews." R. 48, Ex. 17 at 2-3. But according to Maxey, agent selection was not typically included in such a plan, and Kirsten had not told him otherwise. R. 54, Ex. A at 3-4. Maxey also argues that Kirsten mischaracterized his efforts in the RFT, which itself makes clear that he was engaged in the project, and that by demanding meeting summaries, Kirsten was attempting "to load Plaintiff up with busy work," so some "would slip through the cracks." R. 48, Ex. 17 at 2; R. 52 at 10.

Maxey also disputes the basis for Kirsten's representation that he failed to achieve his second goal, to "Drive Insights." According to the RFT, Maxey sent Kirsten a project plan for new research despite that "the business partner requested a synthesis of existing research." R. 48, Ex. 17 at 3. But Maxey claims that he warned Kirsten that the existing research did not sufficiently address the issue the business partner was concerned about, and Kirsten told him to synthesize it anyway. R. 54, Ex. A ¶ 13. The RFT cites the same alleged failure as the basis for the conclusion that Maxey failed with respect to his third goal: "We Drive Results." R. 48, Ex. 17 at 4; R. 52 at 11.

Maxey also disputes the basis for his alleged failure to satisfy his fourth goal: the leadership principle "We're Transparent." The RFT points to: (1) a delay in responding to a business partner's request for research; and (2) Maxey's initiating a project without first getting Kirsten's permission. R. 48, Ex. 17 at 4-5. But according to Maxey, any delay in providing research was due to his initial determination that the research simply was not relevant (and that Kirsten indicated that he understood

that at the time), R. 54, Ex. A at 4, and Maxey was not required to get advance permission to initiate the project at issue, R. 54, Ex. A ¶ 15.

Allstate contends that Maxey's refutations via declaration and deposition testimony (without more) amount to "personal disagreements with Allstate's perception of his job performance," are self-serving and speculative, and cannot defeat summary judgment. R. 55 at 4 (emphasis in original omitted). But the Seventh Circuit has repeatedly found that a nonmoving party's affidavit, declaration, or deposition testimony alone can defeat summary judgment. *See e.g., Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (affidavit) and *Johnson*, 892 F.3d at 901 (declaration and deposition testimony). And there is no argument that Maxey's testimony is not based on personal knowledge or is otherwise inadmissible at trial. *Harper*, 2019 WL 1281987 at *7. Further, the Court is mindful that it does not sit as a "super personnel department that second-guesses employer's business judgments." *Milbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (internal citation and quotation omitted). But this is not a case in which the plaintiff argues that faulty reasoning or mistake led to his troubles. Instead, Maxey attacks the truth of the representations that led to his termination—the very essence of pretext. *See Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) ("A plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination.") (internal quotations and citations omitted). At its core, this case pits one party's word against the other's. The Court cannot resolve a summary judgment

motion by making credibility determinations. *See Johnson*, 892 F.3d at 893 ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants."). As such, a dispute of fact remains regarding whether Kirsten honestly believed Maxey's performance was deficient.

But it isn't just that the reasons given for Maxey's termination may be exaggerated or untrue. There's also the undisputed fact that Maxey's replacement (hired at least in part by Kirsten) was just half his age and paid more than he was out of the gate. And that a jury could infer from Kirsten's threats and actions—for example, Kirsten's approaching HR early on so that he could understand whether he could place Maxey on a UN right away, and his threat that he was going to rate Maxey "unacceptable," even before the PAP commenced—that Kirsten appeared to have been working toward Maxey's termination from the outset. And finally there's Maxey's claim that Kirsten made several ambiguous comments to him, including referring to Maxey as "old," "stuck in the past," "not worth the money [he was] making," and that he "[did]n't want to look at new things." And still other comments that "we could get two people for what we pay for you," and "younger people do things faster." Kirsten denies making these remarks. But his denials are due no weight here. *See Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) ("At the summary judgment stage, we must assume that the defendant's agents made the statements attributed to them.").

Allstate also argues that the comments are not necessarily related to age. The Court agrees that many of the comments standing alone do not directly implicate age.

But in light of Kirsten's statement that he did not want to hire another older worker because older workers don't take direction well, a reasonable jury could readily conclude that the more ambiguous remarks made directly to Maxey were motivated by discriminatory animus. Whether to give weight to such remarks (and if so, what amount), is an issue for the jury. *See Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) ("A jury is the appropriate body to evaluate the significance of [ambiguous] statements.").

Despite Allstate's urging, nor will the Court discount these comments as insufficiently connected to Kirsten's decision to terminate Maxey. The cases Allstate cites in which courts declined to consider similar ambiguous comments did so when analyzing whether the comments alone sufficed under the "direct method," and/or when the comments were the only evidence of pretext under *McDonnell Douglas. See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) (analyzing "stray remarks" under the direct method); *see also Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1330 (7th Cir. 1995) (accord); *Weiss v. Campagna-Turano Bakeries, Inc.*, 76 F. Supp. 2d 936, 940-41 (N.D. Ill. 1999) (accord). But the "direct method" is no longer viable, and Maxey relies on more than remarks here.

Next, Allstate argues that any inference of discrimination is belied by the fact that Kirsten himself was over 40. But an older worker can be discriminated against by an older supervisor, and this seems particularly possible where, as here, the age difference between them is 18 years. *See* Age Discrimination, U.S. Equal Employment Opportunity Commission, eeoc.gov/laws/types/age.cfm (last visited

Feb. 14, 2020) ("Discrimination can occur when the victim and the person who inflicted the discrimination are both over 40."). Nor is it dispositive that the majority of the MARA department was over 40. Kirsten, the decisionmaker, directly oversaw only Maxey and Romanova, both of whom were in their 60s. He had trouble with each, and again, replaced one with a substantially younger employee. The Court agrees with Maxey that a reasonable jury could infer on this record that Romanova was retained to improve appearances and lessen the chances of a lawsuit like this one.

In sum, summary judgment is not proper on this record because particularly in light of Kirsten's comments and the evidence of pretext, a rational jury could conclude that Kirsten constructed a basis for terminating Maxey and the true reason was his age.

**Ortiz.** The Court reaches the same result "assessing cumulatively all the record evidence" as directed by *Ortiz*. *David*, 846 F.3d at 227. Indeed, and for the reasons identified above, a reasonable jury could conclude that Kirsten recommended Maxey's termination because of his age. Questions remain regarding whether Kirsten truly believed Maxey's performance was deficient in the ways described. That dispute is colored by Kirsten's ambiguous comments, and the fact that Kirsten replaced Maxey with someone half his age (and paid her more). Ultimately, the jury in any trial of this matter may conclude that Kirsten did honestly believe the information he provided in his written record of discipline and RFT. Alternatively, the jury may conclude that Kirsten simply disliked Maxey. A jury also could determine that Maxey's age was a factor, but not the "but for" factor behind Maxey's termination.

But because on this record the same reasonable jury viewing the evidence in the light most favorable to Maxey could conclude that Maxey's age was the determining factor, summary judgment is improper, and Allstate's motion is denied.

## II.  Mitigation

Allstate argues in the alternative that Maxey failed to mitigate his damages by declining offers of employment, and that in his response to the contrary, Maxey "incorrectly flip[ped] the burden of proof as to mitigation." R. 55 at 10. But failure to mitigate is an affirmative defense, and Maxey is correct that Allstate has not met its burden here.

Generally, an employment discrimination plaintiff has a duty to use reasonable diligence in finding substantially equivalent employment after unlawful discharge. *NLRB v. Midwestern Personnel Servs., Inc.*, 508 F.3d 418, 423 (7th Cir. 2007). To prevail on the issue, the employer must prove both: (1) that the plaintiff was not reasonably diligent in seeking other employment; and (2) that there was a reasonable chance that he might have found comparable employment with the exercise of such diligence. *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990). A plaintiff's refusal of a job "substantially equivalent to the one he was denied" is a failure to mitigate. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).

There is no dispute that while employed with Allstate, Maxey earned a salary of over $106,000. And there is no dispute that Maxey interviewed for positions with other employers and discussed salaries with those employers ranging from $80,000 to $90,000. But even assuming that Maxey was formally offered the positions

associated with those salaries (which he disputes), Allstate has failed to demonstrate that the positions were "substantially equivalent" to his position with Allstate such that he should have accepted the offer at the time. *See Meyer v. United Air Lines, Inc.*, 950 F. Supp. 874, 876 (N.D. Ill 1997) (noting that a substantially equivalent position affords "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status," and that a discrimination plaintiff "is permitted to take . . . a permanent job which might pay less money . . . only after the plaintiff has made reasonable and diligent efforts to find comparable employment") (citing *Ford Motor*, 458 U.S. at 231, 232 n. 14 & 16). Indeed, the highest salary discussed would have been a 15% pay cut. And despite Allstate's urging, that salary cannot be inflated on the basis of a bonus that is unsubstantiated by the evidence. The only evidence of a bonus opportunity came from Maxey's deposition testimony. But that testimony was speculative at best, and did not address the requirements for earning or otherwise receiving any such bonus. *See* R. 48, Ex. 1 at 306-07 (Maxey deposition testimony excerpt in which he stated that he did not know or recall what the bonus structure was, but "it was around 10 percent because that's what most companies will offer you."). As such, and with nothing other than speculation about the timing of the interviews in question, Allstate falls short of demonstrating that Maxey refused a "substantially equivalent" position as a matter of law, and, even if it had done so, when that refusal occurred so as to cut off Maxey's backpay award. As such, summary judgment is also denied as to mitigation.

## Conclusion

For these reasons, the Court denies Allstate's motion for summary judgment. R. 48-1.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: February 21, 2020